UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JASON GERHARD,

    *Plaintiff*,

v.

FEDERAL BUREAU OF PRISONS,

    *Defendant.*

Civil Action No. 16-1090 (RDM)

## MEMORANDUM OPINION

Plaintiff Jason Gerhard, proceeding *pro se*, brought this action against the Bureau of Prisons ("BOP") to compel the production of records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In response to Gerhard's lawsuit, the BOP located and released additional responsive records. The BOP now moves for summary judgment, Dkt. 9, and Gerhard requests an award of costs, Dkt. 13 at 3–4. Because the BOP has discharged its FOIA obligations, but appears to have done so only because Gerhard filed this lawsuit, the Court will grant the BOP's motion for summary judgment and will award Gerhard his reasonable costs.

### I. BACKGROUND

Gerhard is a federal prisoner and a self-described "researcher/news reporter . . . who writes articles about the . . . BOP." Dkt. 1 at 1–2 (Compl. ¶ 3). He runs a website where he posts the results of his various FOIA requests and maintains a political blog. *Id.* At the times relevant here, Gerhard was incarcerated at Federal Correctional Institution Fairton ("FCI Fairton"). *See* Dkt. 9-1 at 8, 11.

On January 12, 2015, Gerhard submitted the FOIA request at issue. *See id.* at 3 (Wallace Decl. ¶ 5a); *id.* at 8. He sought three categories of records:

> (1) "[t]he contract for the copier (photocopier) machine at FCI Fairton's library that is for inmate use;"
>
> (2) "the quarterly reports detailing donations made to FCI Fairton (per [BOP Program Statement] 1350.02)" from October 2009 to December 2010; and
>
> (3) the same quarterly reports for the period of "April 2012 to the present time."

*Id.* at 8. BOP attorney John E. Wallace handled the request. *See id.* at 1–7 (Wallace Decl.).

To locate the copier contract, Wallace reached out to FCI Fairton's "Trust Fund Supervisor," who "was the sole curator of documents concerning the inmate copier service." *Id.* at 4–5 (Wallace Decl. ¶¶ 7, 10). The supervisor explained that "there is no formal written contract concerning inmate copiers." *Id.* at 4 (Wallace Decl. ¶ 7). Although "[the inmate] [c]opier service is provided by an outside contractor," *id.* at 18 (BOP Program Statement 4500.11 at 52 (Apr. 9, 2015)), the BOP does not pay for those services directly. Instead, the BOP purchases "copy cards" from the contractor in bulk, and then sells those cards to inmates at a mark-up. *See id.* at 4 (Wallace Decl. ¶ 7); *id.* at 17–18 (BOP P.S. 4500.11 at 38, 52). At FCI Fairton, "[t]he sale/purchase of the cards was handled with invoices and purchase orders," rather than "a fixed, traditional government contract." *Id.* at 4 (Wallace Decl. ¶ 7).

Wallace also searched for the quarterly donation reports. *Id.* at 5 (Wallace Decl. ¶ 8). Under BOP Program Statement 1350.02, prison wardens may accept donations to BOP institutions if the donation is valued at $250 or less and (1) is religious or educational in nature and from a religious or educational source, or (2) is from a prisoner leaving federal custody or being transferred between prisons. *See id.* at 24–25 (BOP Program Statement 1350.02 at 2–3, §§ 5–6 (June 29, 1998)). Wardens must submit quarterly reports of such donations to the BOP's Ethics Officer. *Id.* In response to Gerhard's request, Wallace contacted FCI Fairton's warden, but not the BOP's Ethics Officer. *Id.* at 5–6 (Wallace Decl. ¶¶ 8, 11). The warden's secretary informed Wallace that the chaplain kept records of the quarterly reports. *Id.* She then requested

the reports from the chaplain, and later relayed them to Wallace. *Id.* None of the reports Wallace received covered the period between October 2009 and December 2010. *Id*.

On April 30, 2015, the BOP responded to Gerhard's request. *See id.* at 3 (Wallace Decl. ¶ 5b); *id.* at 9–10. With respect to the copier contract, the BOP informed Gerhard that it located no responsive records. *Id.* at 10. With respect to the donation reports from October 2009 through December 2010, the BOP merely referred Gerhard to his March 2012 request for the same records, to which the BOP had already responded (although the BOP's earlier search had also come up empty). *See id.* at 9, 14 n.1. With respect to the donation reports from April 2012 to January 2015, the BOP released 17 pages of records, 5 of which included redactions pursuant to 5 U.S.C. § 552(b)(6) and (b)(7)(C). *See id.* at 3, 5 (Wallace Decl. ¶¶ 5b n.2, 9); *id.* at 9.

Gerhard lost his administrative appeal on September 4, 2015, *id.* at 3 (Wallace Decl. ¶ 5e); *id.* at 14–15, and several months later commenced this action, Dkt. 1 at 3. Service was effected on June 24, 2016. Dkt. 7 at 1. On August 23, 2016, Wallace uncovered eight new pages of responsive records, comprising the missing quarterly donation reports for the period October 2009 to December 2010. Dkt. 9-1 at 6 (Wallace Decl. ¶¶ 12–13). Wallace found the missing reports by asking the Ethics Branch of the BOP's Office of General Counsel to provide them—a step he had not taken during his initial search. *See id.* at 5–6 (Wallace Decl. ¶¶ 8, 11, 12). The BOP then released those eight additional pages to Gerhard in full. *Id.* at 6 (Wallace Decl. ¶ 13).

The BOP now contends that it has discharged its FOIA obligations and moves for summary judgment. Dkt. 9. Gerhard opposes the entry of summary judgment with respect to the copier contract and the quarterly donation reports from October 2009 to December 2010. Dkt. 13. His opposition brief also requests an award of his costs of bringing this action. *Id.* at 3–4.

3

## II. ANALYSIS

**A. Motion for Summary Judgment**

In FOIA cases, "an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested" has been produced in full, has been produced with redactions authorized under FOIA, or is "wholly exempt from [FOIA's] inspection requirements." *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (citation and internal quotation marks omitted). The agency may meet its burden by submitting "relatively detailed and non-conclusory" declarations. *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks and citation omitted). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

    1. *Contract for the Copier*

The BOP defends its failure to produce the requested "contract for the copier," Dkt. 9-1 at 8, on the ground that "the contract sought does not exist," Dkt. 9 at 9. Wallace's declaration and the BOP's official program statement confirm that conclusion. *See* Dkt. 9-1 at 4–5 (Wallace Decl. ¶¶ 7, 10); *id.* at 18 (BOP P.S. 4500.11 at 52). These documents demonstrate that, rather than relying on an overarching contract for copier services, the BOP pays the contractor through itemized purchases of "copy cards," which it then re-sells to inmates at a marked-up price. In other words, there is no written "contract for the copier." Gerhard does not contend that his FOIA request should be construed as a request for the itemized copy card invoices.[1] *See* Dkt. 13 at 2–3. As a result, because the BOP "d[oes] not violate the disclosure requirements of the FOIA

---

[1] To the contrary, the BOP has produced examples of such invoices, *see* Dkt. 9-1 at 19–21, and Gerhard appears to consider them unresponsive to his request, *see* Dkt. 13 at 2–3.

by failing . . . to disclose a record it does not have," *DeBrew v. Atwood*, 792 F.3d 118, 123 (D.C. Cir. 2015), the BOP has discharged its obligations with respect to the requested contract.

In opposition, Gerhard argues that a contract *must* exist, given the BOP's statement that "[c]opier service is provided by an outside contractor." Dkt. 9-1 at 18 (BOP P.S. 4500.11 at 52). The word "contractor," he says, means "'one that contracts or is a party to a contract.'" Dkt. 13 at 3 (quoting *Contractor*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003)). He then argues that "a contract, or similar document, must exist where a contractor exists." *Id.*

The word "contractor," however, is not limited to the narrow meaning that Gerhard posits. To be sure, Black's Law Dictionary defines the word as "[a] party to a contract." *Contractor*, BLACK'S LAW DICTIONARY (10th ed. 2014). But it also defines the word "more specif[ically]" as "one who contracts to do work for or supply goods to another." *Id*. It is in this latter sense, at least, that the BOP appears to use the term: the third-party company has agreed to sell the BOP "copy cards," and those sales are memorialized in a series of itemized invoices. The BOP has provided examples of these invoices, *see* Dkt. 9-1 at 19–21, and Gerhard may request further examples through FOIA if he so desires. There is no dispute, however, that the FOIA request at issue did not seek the copy card invoices, but rather sought "[t]he contract for the copier (photocopier) machine at FCI Fairton's library." *Id.* The BOP has demonstrated through a detailed declaration that no such written contract exists. Accordingly, the BOP is entitled to summary judgment on this aspect of Gerhard's claim.

2.  *Quarterly Donation Reports*

Gerhard's FOIA request also sought certain "quarterly reports detailing donations made to FCI Fairton." Dkt. 9-1 at 8. The BOP contends that it has now conducted an exhaustive search for those records and released 25 responsive pages, 5 of which contained redactions. *See id.* at 5–6 (Wallace Decl. ¶¶ 8, 9, 11–14). Gerhard does not challenge the appropriateness of the

5

redactions or offer any basis on which to question the adequacy of the search that the BOP ultimately conducted.  *See* Dkt. 13 at 3.

Instead, Gerhard opposes the entry of summary judgment in favor of the BOP on the ground that the BOP released eight of those pages only *after* Gerhard filed this lawsuit, thereby "forcing an indigent prisoner to pay a prohibitive filing fee in order to obtain the requested documents." *Id.*  "[T]o grant a motion for summary judgment in the [BOP]'s favor," Gerhard says, "would embolden the [BOP]'s practice of improperly withholding information from prisoners until they file a civil complaint." *Id.*

Gerhard's concern is understandable, but it is best directed at his request for costs; it has no bearing on summary judgment.  Summary judgment is not a punishment or reward, but a determination of the merits of a case or claim.  The BOP is entitled to summary judgment if it has produced "each document that falls within the class requested." *Students Against Genocide*, 257 F.3d at 833.  There is no dispute that it has done so here.  The Court, accordingly, will grant summary judgment in favor of the BOP.

**B.  Request for Costs**

Gerhard's brief in opposition to the BOP's motion for summary judgment also requests that the Court award him his costs of the litigation.  *See* Dkt. 13 at 3–4.  As an initial matter, the BOP objects that this request "is premature" and "should be appropriately styled as a motion." Dkt. 14 at 3.  As to the first point, the BOP would be correct but for the fact that the Court has just determined that it will enter judgment for the BOP.  That objection, therefore, is moot.  As to the second point, the BOP is correct that this request should formally be styled as a motion.  *See* Fed. R. Civ. P. 7(b)(1).  But, because the substance of Gerhard's request complies with the rules governing motions, *see id.*; LCvR 7, because the BOP has submitted a brief opposing the request on the merits, *see* Dkt. 14 at 3–4, and because Gerhard will not be prejudiced by the Court

6

deciding his motion without a final reply brief, the Court will liberally construe Gerhard's *pro se* opposition brief as a cross-motion for an award of costs other than attorney's fees.[2] *See Pinson v. Lappin*, 806 F. Supp. 2d 230, 235–37 (D.D.C. 2011) (awarding costs to *pro se* FOIA plaintiff who made his request as part of his summary judgment opposition brief).

Under FOIA, the Court "may assess against the United States . . . litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). This test has two components: eligibility and entitlement. "The eligibility prong asks whether a plaintiff has 'substantially prevailed' and thus 'may' receive [costs]. If so, the court proceeds to the entitlement prong and considers a variety of factors to determine whether the plaintiff *should* receive [costs]." *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (citation omitted). The BOP disputes only the eligibility prong. *See* Dkt. 14 at 3–4.

1. *Eligibility*

As relevant here, a FOIA plaintiff "substantially prevails"—and is thus eligible for an award of costs—if he obtains relief through "a voluntary or unilateral change in position by the agency, if the [plaintiff's] claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). Courts have read this provision "essentially [to] codif[y] the so-called 'catalyst theory' for determining a fee request against the United States, under which a plaintiff is deemed to have 'substantially prevailed' for purposes of § 552(a)(4)(E) if the 'litigation substantially caused the requested records to be released.'" *N.Y.C. Apparel F.Z.E. v. U.S. Customs & Border Prot. Bureau*, 563 F.

---

[2] Although Gerhard also requests an award of "fees," Dkt. 13 at 3, that phrase appears to refer to "the *filing* fee" for this action, *id.* at 4 (emphasis added), as opposed to attorney's fees. To the extent Gerhard means to request attorney's fees, that request must be denied. *Pro se* litigants are not eligible for FOIA attorney's fees. *Burka v. HHS*, 142 F.3d 1286, 1290 (D.C. Cir. 1998).

7

Supp. 2d 217, 221 (D.D.C. 2008) (quoting *Chesapeake Bay Found., Inc. v. U.S. Dep't of Agric.*, 11 F.3d 211, 216 (D.C. Cir. 1993)); *see also, e.g.*, *Brayton*, 641 F.3d at 524, 526–27; *Pinson*, 806 F. Supp. 2d at 235.[3] Gerhard expressly invokes the catalyst theory here. *See* Dkt. 13 at 4. To prevail on it, he "'must show that prosecution of the action could reasonably be regarded as necessary to obtain the information and that a causal nexus exists between that action and the agency's surrender of the information.'" *Harvey v. Lynch*, 178 F. Supp. 3d 5, 7 (D.D.C. 2016) (quoting *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 588 (D.C. Cir. 1981)). "Whether a party has made such a showing in a particular case is a factual determination that is within the province of the district court to resolve." *Church of Scientology of Cal.*, 653 F.2d at 588 (quoting *Cox v. U.S. Dep't of Justice*, 601 F.2d 1, 6 (D.C. Cir. 1979)).

In this case, there is ample basis to conclude that Gerhard's lawsuit "substantially caused" the release of the missing eight pages of records. The BOP had twice before attempted—and failed—to locate the missing documents. Dkt. 9-1 at 5–6 (Wallace Decl. ¶¶ 8, 11); *id.* at 14 n.1. Only after Gerhard filed this lawsuit did the BOP search for the quarterly reports at the BOP's Ethics Office—*i.e.*, at the office designated to receive them. *See id.* at 6 (Wallace Decl. ¶ 12); *id.* at 24–25 (BOP P.S. 1350.02 at 2–3, §§ 5–6). The BOP has offered no explanation as to why it did not take this obvious step during its earlier searches. *See id.* at 6 (Wallace Decl. ¶¶ 12, 13). And, given that the BOP considered Gerhard's request resolved as of September 2015, *see id.* at 14–15, it strains credulity to imagine that the BOP would have

---

[3] The Court has previously noted that the "literal terms of the statute" do not on their face require a causal nexus between the lawsuit and the release of documents. *See Sai v. TSA*, 155 F. Supp. 3d 1, 6 n.4 (D.D.C. 2016). But, given the D.C. Circuit's statement that that "[t]he purpose and effect" of § 552(a)(4)(E)(ii) was "to change the 'eligibility' prong back to . . . the days of the catalyst theory," *Brayton*, 641 F.3d at 525, and given that the same type of causation analysis factors into the "entitlement" prong in any event, *see Sai*, 155 F. Supp. 3d at 6 n.4, the Court concludes that § 552(a)(4)(E)(ii) incorporates a causal nexus requirement.

undertaken this new search in August 2016 had Gerhard not filed this lawsuit a few months before that.

Although the BOP concedes that it conducted its new search "[i]n response to Gerhard's complaint," Dkt. 9 at 6, it nonetheless argues that Gerhard has "fail[ed] to show that his complaint caused the BOP's release of the additional eight pages of documents" because "'[t]iming in itself . . . does not establish causation as a matter of law,'" Dkt. 14 at 4 (quoting *Pub. Law Educ. Inst. v. U.S. Dep't of Justice*, 744 F.2d 181, 184 n.5 (D.C. Cir. 1984)). It is of course true that "an allegedly prevailing complainant must assert something more than *post hoc, ergo propter hoc*." *Church of Scientology of Cal.*, 653 F.2d at 588 (quoting *Cox*, 601 F.2d at 6). But, for several reasons, the Court's finding of a causal nexus is based on more than the mere fact that the release of the missing eight pages post-dated the filing of the lawsuit.

For one, the relative sizes of the gaps in response times support a finding of causation. Almost twelve months passed between the close of Gerhard's administrative appeal and Wallace's new search for the missing documents. *See* Dkt. 9-1 at 14–15 (appeal closed on September 4, 2015); *id.* at 6 (Wallace Decl. ¶ 12) (new search on August 23, 2016). By contrast, only two months elapsed between the service of the complaint in this lawsuit and Wallace's new search. *See* Dkt. 7 at 1 (service effected on June 24, 2016). It stands to reason that the lawsuit was the likely cause of the August 2016 search, rather than, say, the BOP's "lack of actual notice of [the] request" (it had been on notice since January 2015) or "an unavoidable delay accompanied by due diligence in the administrative processes" (which closed in September 2015). *Church of Scientology of Cal.*, 653 F.2d at 588 (quoting *Cox*, 601 F.2d at 6). The BOP, moreover, offers no explanation for its failure to locate the records during its pre-litigation searches, leaving Gerhard's lawsuit as the only apparent candidate for what prompted the new

9

search. *See* Dkt. 9-1 at 5–6 (Wallace Decl. ¶¶ 11–12). And, finally, the fact that the BOP initially failed to search for the missing records in the office designated to receive them suggests that the BOP needed additional prodding—and not just additional time—to comply with Gerhard's request. *Cf. Church of Scientology of Cal.*, 653 F.2d at 588 (causation analysis depends on, among other things, the quality of the agency's initial search). The Court therefore finds that Gerhard's lawsuit was the "catalyst" for the release of the missing eight pages of documents.

Separately, the BOP also asserts that Gerhard "has failed to demonstrate that his claims were 'not insubstantial'" within the meaning of § 552(a)(4)(E)(ii). Dkt. 14 at 4 (citing *Sai*, 155 F. Supp. 3d at 6). Because the BOP provides no further analysis on this point, *see id.*, it is difficult to know what the BOP means by this. But, in any event, to the extent that this statutory language imposes requirements beyond those of the catalyst theory, those requirements are "lenient" and demand less than "that a plaintiff's claim be correct on the merits." *Brayton*, 641 F.3d at 526. That standard is easily met here: At the time Gerhard filed suit, the BOP had yet to release eight pages of responsive documents. And the BOP has offered no basis by which the Court could conclude that this omission was justified. As a result, Gerhard's claim with respect to the quarterly reports was "not insubstantial," and he, accordingly, is eligible for an award of costs.

    2.    *Entitlement*

Eligibility, however, does not end the inquiry—the Court must still decide whether Gerhard is entitled to costs. *Brayton*, 641 F.3d at 524. Courts typically consider four factors in assessing entitlement: "'(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding' of the requested documents." *McKinley v. Fed. Hous. Fin. Agency*,

739 F.3d 707, 711 (D.C. Cir. 2014) (quoting *Tax Analysts*, 965 F.2d at 1093). *But see Morley v. CIA*, 719 F.3d 689, 690 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("We should ditch the four-factor standard."). Courts "often combine[] the second and third factors into a single factor assessing whether a plaintiff 'has sufficient private incentive to seek disclosure' of the documents without expecting to be compensated for it." *McKinley*, 739 F.3d at 711 (quoting *Davy v. CIA*, 550 F.3d 1155, 1160 (D.C. Cir. 2008)). "No one factor is dispositive." *Davy*, 550 F.3d at 1159.

Here, Gerhard's filings touch on all four of the factors, *see* Compl. ¶ 3; Dkt. 13 at 3–4, but the BOP fails to address the entitlement prong at all, *see* Dkt. 14 at 4. In any event, the Court's own assessment of the factors shows that the balance favors Gerhard.

The public benefit weakly counsels for an award of costs. This factor "requires consideration of both the effect of the litigation for which fees [or costs] are requested and the potential public value of the information sought." *Davy*, 550 F.3d at 1159. The "effect of the litigation" here was the release of eight pages of records reflecting donations to FCI Fairton of $250 or less that were made by educational or religious groups or by BOP prisoners leaving custody or being transferred. *See* Dkt. 9-1 at 5–6 (Wallace Decl. ¶¶ 9, 11, 13); *id.* at 8; *id.* at 24–25 (BOP P.S. 1350.02 at 2–3, §§ 5–6). It appears that these records "w[ere] not previously available to the public," *Davy*, 550 F.3d at 1159, but now may be available on Gerhard's website, *see* Compl. ¶ 3. Although the "potential public value of the information sought" does not clearly support an award of costs, it is conceivable that information about BOP donors could "add to the fund of information that citizens may use in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995). At the very least, the public benefit from these documents is more than "minimal" and does more than "subsidize a matter of [Gerhard's] private

11

concern or curiosity." *Pinson*, 806 F. Supp. 2d at 236 (internal quotation mark omitted) (quoting *Blue v. BOP*, 570 F.2d 529, 533–34 (5th Cir. 1978)). This factor at least marginally favors Gerhard.

As to whether Gerhard "has sufficient private incentive to seek disclosure" without expecting compensation, *McKinley*, 739 F.3d at 711, the answer is plainly "no." Gerhard represents, and the Court has no reason to doubt, that he "derives no commercial benefit from the articles he writes based off of FOIA documents." Dkt. 13 at 4. And, although Gerhard's website may not attract a substantial readership, his purpose in requesting the documents does resemble that of "a journalist who 'gathers information of potential interest to a segment of the public, uses [his] editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.'" *Davy*, 550 F.3d at 1161–62 (alteration in original) (quoting *Tax Analysts*, 965 F.2d at 1095). Congress intended persons acting on such motivations "to be favorably treated under FOIA's fee provision." *Id.* Finally, given Gerhard's indigent status, *see* Dkts. 3 & 4, this case seems to present the type of situation in which court costs impose substantial barriers to the FOIA requestor's access to the documents,[4] *see Tax Analysts*, 965 F.2d at 1095. The second and third factors, accordingly, favor Gerhard.

Lastly, "the reasonableness of the agency's withholding of the requested documents" favors Gerhard most of all. As the Court has explained, the BOP should have realized from the outset that responsive records might be kept at the Ethics Branch of the BOP's Office of General Counsel. After all, the BOP Program Statement expressly states that the requested records "must be reported quarterly to the [BOP's] Ethics Officer." Dkt. 9-1 at 24–25 (BOP P.S. 1350.02 at 2–

---

[4] Although Gerhard is proceeding *in forma pauperis*, *see* Dkt. 4, as a prisoner, he must still pay the full $400 filing fee over time, *see* 28 U.S.C. § 1915(b).

3, §§ 5–6).  The BOP has offered no explanation for its failure to seek documents from the Ethics Officer until faced with Gerhard's lawsuit.  *See id.* at 5–6 (Wallace Decl. ¶¶ 11–12).  The Court thus agrees with Gerhard that he, as "an indigent prisoner," should "[not have needed] to pay a [nearly] prohibitive filing fee in order to obtain the [missing] documents."  Dkt. 13 at 3.

The Court, accordingly, finds that Gerhard is entitled to his reasonable costs of litigation pursuant to 5 U.S.C. § 552(a)(4)(E).

## CONCLUSION

The Court will **GRANT** the BOP's motion for summary judgment, Dkt. 9, and will allow Gerhard to file a bill of costs in accordance with Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54.1(a) on or before August 1, 2017.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 11, 2017